Hitchcock, C. J.
The questions raised in this case are important, and are fairly presented in the bill of exceptions. These questions are not so important as respects the parties litigant, as they are in view of the consequences which may result from their determination, one way or the other.
The facts of the case, as disclosed in the bill of exceptions, are these: The land in controversy is in the north part of the state, and north of the line designated by the act of congress authorizing the people of the eastern division of the territory north-west of Ohio to organize a state government, as the northern boundary line of the contemplated state. J. V. C. Sutphen was the legal owner of this land until October 26, 1836, when he conveyed the same to Stevens, the lessor of the original plaintiff. Previous to this time, however, Sutphen had entered into contract with one Stephen B. Comstock, under whom the plaintiff in error claims title, to sell and convey the premises to him, Comstock. On the *237 26th April, 1836, Comstock caused a bill in chancery to be filed in the clerk’s office of the court of common pleas of Lucas county, to compel the specific performance of this contract. On the 28th day of the same month, a subpoena was issued, and returned by the sheriff on the same day, that he had served the same by leaving a copy at the usual place of residence of the said Sutphen. It is agreed, in the statement of facts, that Sutphen was absent from home at the time, and that his place of residence, at which the copy was left, was north of the aforementioned boundary line, and within the territorial limits of Michigan, as designated by the boundaries of that territory, specified in the act of congress erecting and organizing the territory. It appears, however, that he knew of the pendency of the suit, previous to the rendition of the decree. '
This case of Comstock v. Sutphen was continued until the November term of the court of common pleas, 1836, when, Sutphen having failed to answer, a decree was entered against him pro confesso, by the terms of which it was provided that if a deed was not executed, the decree should operate as a conveyance, pursuant to the statute of Ohio, in such case made and provided. Subsequently a bill of review was prosecuted, but this was dismissed. Comstock, claiming title under this decree, made a deed of conveyance to the plaintiff in error. If the court of common pleas had jurisdiction of the person of Sutphen, .and of the subject-matter, the title of the plaintiff in error was complete, and both the court of common pleas and supreme court erred; for although the deed from Sutphen to Stevens was anterior in date to the decree, still that deed was executed during the pendency of the suit in chancery, and in such circumstances it is right and proper to hold that the decree overreaches and is paramount to the deed.
It is further admitted in the case, that from the organization of the territory of Michigan, she exercised jurisdiction over the country north of the line before referred to, as designated by congress for the north line of Ohio, and continued to ex *238 ercise the same jurisdiction until the act of congress of 23d June, 1836, when another line was designated as the northern boundary of Ohio, and the southern boundary of Michigan. Further it is admitted that Sutphen resided north of that line, and that he was at no time within what Michigan admitted to be the true boundary of Ohio. The land in con troversy is north of the same line.
As before stated, one question raised, and the great question in the case, is a question of jurisdiction. A court of chancery, like a court of law, must have jurisdiction of 'the subject-matter, and of the person. So far as proceedings in our own state are concerned, the mode of acquiring jurisdiction of the person is prescribed by law. If the defendant be a resident, jurisdiction is acquired by service of a subpoena, but if a non-resident, and the court have jurisdiction of the subject-matter, then other modes of giving notice are specified. Although the defendant may not be a resident, still if within the jurisdiction, at any time, he may be served with subpoena while so within the jurisdiction. But I presume it will not be contended that a subpoena served in another state or territory, will confer upon a court in this state jurisdiction. Before a decree can be operative, the court must have jurisdiction of the person, as well as of the subject-matter.
Under our law it is provided that a decree for the conveyance of land shall operate as a conveyance. But in order that a decree shall thus operate, the land itself must be within the jurisdiction of the court. If the land, which is the subject matter in controversy or of the decree, is within a foreign jurisdiction, the decree cannot operate as a conveyance. It must be enforced by attachment or otherwise, as the case may require.
Again, if at the time of filing a bill, the land which is the subject-matter of controversy, is within a foreign jurisdiction, we apprehend that the final decree could not operate as a conveyance, although at the time of the rendition of the decree, the land might be within the jurisdiction of the court rendering it.
*239 Applying these principles to the case now under consideration, it follows, that if Sutphen, at the time of the service of the subpoena, was within the jurisdiction of Michigan, the court of Ohio did not get jurisdiction of his person by that service, and could not upon that service render a valid decree against him. If at the time of the filing of the bill, and the institution of the proceedings, the land was within the jurisdiction of Michigan, the final decree would not operate as a conveyance of that land. /
It will be seen that the whole difficulty in the case grows out of the contested boundary question between Ohio and Michigan, and which at one time threatened serious consequences. On the 30th April, 1802, the congress of the United States enacted a law “ to enable the people of the eastern division of the territory northwest of the river Ohio, to form a constitution and state government, and for the admission of the same into the Union,” etc. (Swan’s Land L. 221.) The second section of said act is as follows:
“ That the said state shall consist of all the territory included within the following boundaries, to wit: bounded on the east by the Pennsylvania line, on the south by the Ohio river, to the mouth of the Greaf Miami, on the west by a line drawn due north from the mouth of the Great Miami aforesaid, and on the north by an east and west line draivn through the southerly extreme of Lake Michigan, running east, after intersecting the due north line aforesaid, from the mouth of the Crreat Miami, until it shall intersect Lake JErie, or the territorial line, and thence with the same through Lake JErie to the Pennsylvania line aforesaid.”
Pursuant to this law the present constitution of Ohio was formed, and a government organized. In the 6th section of the seventh article the boundaries of the state are specified, and in giving these boundaries, the precise words of the second section of the before recited act of congress are used, but the same are followed by a provision in these words: “ Provided always, and it is hereby fully understood and declared by this convention, that if the southerly bend or extreme of Lake Michigan should extend so far south that a *240 line drawn due east from it should not intersect Lake Erie, or if it should intersect the said Lake Erie, east of the line of the mouth of the Miami river of the Lake, then and in that case, with the assent of the congress of the United States, the northern boundary of this state shall be established by, and extended to a direct line running from the southern extremity of Lake Michigan, to the most northerly cape of the Miami Bay, after intersecting the due north line from the mouth of the Great Miami river as aforesaid, thence northeast to the territorial line, and by the said territorial line, to the Pennsylvania line.
This proviso was probably introduced in consequence of the uncertainty which prevailed as to the latitude of the southern extreme of Lake Michigan, which when explored was found to be much further south than was supposed at the time of the passage of the aforesaid act of congress, and of the formation of the constitution of Ohio.
Under this constitution, Ohio was admitted into the Union, but there was ho express assent by congress to the change of this northern boundary line.
In 1805, by a law of congress, the territory of Michigan was constituted and organized. By this act the southern boundary is described as a line running due east from the most southern extreme or bend of Lake Michigan. It is in fact the same line which in the act of 1802, before referred to, is described as the northern boundary of the then contemplated state, which was afterwards organized by the name of Ohio.
This act for the erection of the territory of Michigan, so far as it has any bearing upon the subject, instead of showing any assent on the part of congress to the change of the north line of Ohio, has a contrary effect.
As the country became better known, and the true situation of the southern extreme of Lake Michigan better understood, the people of Ohio became more solicitous about this northern boundary line, and various appeals were made to the general government, to have the question settled. As *241 early as 1807 a resolution was adopted by the general assembly, as follows:
“ Whereas, the northern boundary line of this state is unsettled, and has never been ascertained, and as it is generally believed that an east and west line, drawn through the southerly extreme of Lake Michigan, running east after intersecting the due north line, will not intersect Lake Erie, or if it should intersect the said lake, it will be at a point east of the Miami of the lake;
“Resolved, by the General Assembly of the State of Ohio, That our senators and representatives in congress be instructed and required to use their influence to obtain the passage of a law to ascertain and define the northern boundary line of this state, and fix the same agreeably to the proviso contained in the sixth section of the seventh article of our constitution.”
This resolution does not indicate that, in the opinion of the body adopting it, the line in the proviso was the true boundary line. The object is to obtain an act of congress sanctioning that line.
Under the law of 1812, two lines were run by direction of the surveyor general of the United States, one in conformity with the act of congress, as copied into the constitution of Ohio, and the other as called for by the proviso in the constitution. The first of these lines was called the Fulton, and the latter the Harris line. But neither of these lines was established as the true boundary line between the State of,Ohio and the territory of Michigan, nor was there any definite action upon the subject by congress until June, 1836. The State of Ohio claimed to the diagonal line, and enforced her claim by powerful, and in the opinion of many of her citizens, by conclusive arguments. This claim was resisted by Michigan, and not acquiesced in by the United States.
Now it seems to the court, that under the circumstances of the case, we are not called upon to decide which o'f the parties to this controversy had the legal right to this territory. *242 It is sufficient for us to ascertain which of them exercised jurisdiction'over it. We concur with plaintiff’s counsel, that it is the government de facto of a country, whose laws and proceedings are to be recognized, whether it be a government de jure or not. With us the question is, which of the two governments, Ohio or Michigan,.exercised jurisdiction over this disputed territory. And .this question is answered by the agreed case. From this it is apparent, that Michigan exercised jurisdiction to the Fulton line, and further there is nothing in the case to show that the people of the territory objected to this jurisdiction!
If, however, this had not appeared in the agreed case, it is a fact well known as matter of history. No serious attempt was made by Ohio to interfere with this jurisdiction until 1884 or ’5. There is a tradition, and I have no doubt it is founded in fact, that at an early period there was an attempt made by the court of common pleas of Wood county, soon after the organization of that county, to exercise jurisdiction north of the Fulton line, but the people refused obedience, and the attempt was abandoned. The jurisdiction of Michigan was acquiesced in. This is apparent from the action of our own general assembly upon the subject of this disputed boundary. In a memorial to congress, adopted by that body on the 22d December, 1834 (33 Ohio L. L. 438), this language is used, “ the occupation by the territory of Michigan, of an integral part of her domain, has thus far been suffered by Ohio, because of its unimportance, while the north-western quarter of the state remained a wilderness,” etc.
At the session of the general assembly at which this memorial was adopted, that body seems to have come to the determination to assert the rights of the state, without further delay, for the action of congress. By an act passed Febru ary 23d, 1835 (33 Ohio L. L. 92), entitled “ an act defining the northern boundary of certain counties in this state,” it is provided in the first section, “ that the counties of Williams, Henry, Wood,” etc., “ shall extend to, and be bounded on the *243 north by a line run from the southern extremity of Lake Michigan, to the most northern cape of Maumee Bay,” etc. The same act provides that certain townships north of the Fulton line; shall be attached to the counties to which they adjoin. All the provisions of this act, go to show that up to the time of its passage, the jurisdiction over the territory had been in Michigan.
By the same act, the governor was authorized to appoint commissioners to survey the northern boundary of the state, according to the proviso in the constitution. Commissioners were appointed accordingly, but they were prevented from running this line by the people of Michigan. In consequence of this failure, and the resistance of Michigan, the general assembly was convened in special session on the 8th of June, 1835, at which session the county of Lucas was organized, made up in a great measure of this disputed territory. This, however, did not quiet the difficulty, for although the court of common pleas attempted to exercise, and did, to a certain' extent, exercise jurisdiction, still, according to the agreed case, Michigan exercised the same jurisdiction as before. The difficulty was not ended until June, 1836, when congress passed a law fixing this boundary in accordance with the wishes of Ohio.
Now if, after the action of the general assembly before referred to, the people in the territory had submitted to the jurisdiction of Ohio, we should have had no difficulty in the case. But when the case shows that the jurisdiction of Michigan was still exercised and still acquiesced in, we incline to the opinion that the court of common pleas did not, by the service of the subpoena, obtain jurisdiction of the person of Sutphen.
But it is argued by counsel for plaintiff in error, that this is a question with respect to which this court has no right to inquire. That the general assembly, having by law extended the jurisdiction of the state over this territory, this court has no right to inquire as to the right of the matter, but musts be bound by, and enforce the law. We cannot admit *244 the -correctness of this principle to the extent claimed. Suppose the general assembly should attempt to extend the western counties of the state into Indiana, or the southern into Kentucky or Virginia, would this court, in its action, be bound to enforce said law ? Would it be bound to disregard the boundaries of the state as fixed in the constitution. We think not.
I presume that it will not be insisted that if this, territory was not within the rightful boundary of Ohio, she had such exclusive jurisdiction as would be recognized when opposed to that of Michigan. Upon this question of right, we have a decision of the circuit court of the United States, and also of the supreme court. In the case of Piatt v. Oliver et al. (2 M’Lean’s Rep. 267), Judge M’Lean, after a careful examination of this subject, comes to the conclusion, and so decides, that the line drawn due west, from the southermost extreme of L'ake Michigan, was the true boundary line between Ohio and Michigan, until altered by the law of congress of June, 1836. The supreme court of the United States, in considering the same case, treats the jurisdiction as being rightfully in Michigan. 3 Howard’s R. 333.
These authorities are entitled to great respect, especially in -a question like the one now raised, where the jurisdiction of a court in a particular case depends upon ascertaining whether the residence of a defendant was within one or another jurisdiction.
Upon a full consideration of the case, we are of opinion that there was no error in the judgment of the supreme court, and the same is affirmed.